FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 13, 2026

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 13, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 103563-2 |
| Respondent, | ) | |
| v. | ) | En Banc |
| JOHN HENRY SLIGER, | ) | |
| Petitioner. | ) | Filed: August 13, 2026 |

MADSEN, J.*—Following a fatal collision with a dirt bike, John Henry Sliger was charged with vehicular homicide. At the scene, Sliger voluntarily took a portable breath test; but prior to taking the test, Sliger was instructed to spit out a lump of chewing tobacco from his mouth. Sliger was arrested and taken to jail. At jail, Sliger agreed to take a Draeger breath test. When asked whether he had foreign substances in his mouth,

---

* Justice Barbara Madsen is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

Sliger denied having any. However, the officer noted tiny strands of tobacco stuck in between Sliger's teeth.

Former RCW 46.61.506(4)(a) (2020)[1] governs the admissibility of breath tests. At issue here is whether the State provided prima facie evidence that Sliger did not have any foreign substances in his mouth at the beginning of the 15-minute observation period prior to administering the test. Former RCW 46.61.506(4)(a)(iii). To determine whether a person has a foreign substance in their mouth before administering a breath test, WAC 448-16-040 requires officers to either examine the individual's mouth or have the person deny that there are any foreign substances in their mouth. Sliger moved to suppress the admission of the Draeger breath test results, arguing that the State failed to meet its prima facie burden that there was no foreign substance in his mouth due to the officer's observation that there were tiny tobacco strands in his teeth. After an evidentiary hearing, the trial court denied the motion based on Sliger's denial of having any foreign substances in his mouth. The Court of Appeals affirmed, holding that an officer can rely on a person's denial so long as they are not aware of the presence of a foreign substance. Sliger sought review here.

We hold that the State produced prima facie evidence that Sliger did not have any foreign substances in his mouth when it provided expert testimony that the tiny strands of

---

[1] The legislature recently amended RCW 46.61.506, effective June 11, 2026. Although the amendment does not affect our analysis, it renumbers former .506(4)(a) as .506(5)(a). We will use the numbering in effect at the time of these events. *See* LAWS OF 2026, ch. 108, § 1.

tobacco observed by the officer would not affect the validity of the breath test. Accordingly, we affirm the Court of Appeals.

BACKGROUND

In April 2020, Sliger was involved in a collision with a dirt bike, and the rider later died as a result of the accident. Deputy Mitchell Kahns arrived at the scene, and Sliger admitted to drinking a few hours before the crash. Sliger agreed to take a field sobriety test, which included a portable breath test. Prior to taking the test, Deputy Kahns noted that Sliger had chewing tobacco in his mouth and instructed him to spit it out, which he did. Sliger was arrested for driving under the influence and taken to jail.

At the jail, Deputy Kahns requested that Sliger provide a Draeger breath test, and Sliger agreed. Prior to administering the test, Deputy Kahns asked Sliger if he had any foreign substances in his mouth, and Sliger denied having any. In his DUI arrest report, Deputy Kahns checked off the box indicating that Sliger denied having any foreign substances in his mouth. He also checked off the box indicating that he visually examined Sliger's mouth. Next, he checked the box indicating that foreign substances were found and explained that there were "tiny tobacco strands stuck in teeth." Clerk's Papers (CP) at 7. The tiny strands of tobacco were not removed prior to administering the test. The Draeger breath test results indicated an alcohol level over the legal limit.

A few hours after administering the test, Deputy Kahns noted in his written report that "[a]fter arriving at the Stevens County Jail, I checked [Sliger] for foreign substances in his mouth, there weren't any substances." CP at 22.

3

The State charged Sliger with vehicular homicide. Sliger filed a motion to suppress the breath test results. He argued that the test results were inadmissible because the tiny strands of tobacco in his teeth constituted a foreign substance that should have been removed before conducting the Draeger test; thus, the test was improperly performed. An evidentiary hearing was held during which the court heard testimony from Deputy Kahns and the State's expert, Trooper John Axtman, a breath test technician.

When questioned about the discrepancies between the DUI arrest report and Deputy Kahns' written report regarding whether foreign substances were found in Sliger's mouth, Deputy Kahns testified that based on his training and experience, although he checked the box that Sliger had a foreign substance in his mouth, he did not believe the strands of tobacco to be a foreign substance under the statute, but since he made note of the strands of tobacco he checked the "yes" box for foreign substances. Deputy Kahns testified that "[t]hey were just small strands of tobacco, chewing tobacco that were small, thin, really short." Verbatim Rep. of Proc. (VRP) at 29. He further testified that the strands were in between just a few of Sliger's teeth.

The State also called Trooper Axtman to testify about the effects of tobacco on the Draeger breath test:

> [Prosecutor]: [If somebody] is chewing tobacco before the 15 minutes and they remove it, are you gonna have any concerns with, you know, if they don't brush their teeth before they do the test?

[Axtman]: If they removed it, no. Now if they didn't remove it then, yeah, I'd have some heartache on it if they left a lump of tobacco in there.

[Prosecutor]: Okay. And you just now said a lump of tobacco. If somebody's got, you know, some flecks on their teeth, is that going to cause you the same heartache as a lump of tobacco?

[Axtman]: No, it's not. I used to chew. And sometimes it can be difficult to get those little tiny grits out of your teeth, even after rinsing it. So, again, you do the best with what you have.

. . . .

[Prosecutor]: Would you consider, you know, having a piece of bread stuck between your teeth or a piece of tobacco flake on your teeth to be foreign substances that would render this invalid, an invalid sample?

[Axtman]: I'd have no—I'd have no concerns with the breath test. With, again, with very small amounts like that.

[Prosecutor]: Uh-huh.

[Axtman]: Now, again, if there were large amounts I would have a concern.

[Prosecutor]: Okay, what do you consider a large amount?

[Axtman]: Well, for tobacco purposes, a lump of tobacco in there.

[Prosecutor]: Okay. Why is that?

[Axtman]: Because it technically is a foreign substance.

[Prosecutor]: Okay. But what is it about having that in there that's going to affect the breath test?

[Axtman]: There's case—there's case studies showing that—if you really want me to get into it I can get into the case studies—but showing the effects or lack of for the breath testing. But, again, the—the—the big lump, that's something that the officer should have removed.

VRP at 49-51.

5

After hearing testimony, the trial court denied the motion to suppress the breath test results. The court concluded that the State met the burden of providing prima facie evidence that Sliger did not have any foreign substances in his mouth at the beginning of the 15-minute observation period based solely on Sliger's verbal denial of having foreign substances present in his mouth.

Sliger petitioned the Court of Appeals for discretionary review, which it granted. The Court of Appeals affirmed the trial court. It held that "[a]n officer can rely on a subject's denial so long as the officer is not otherwise aware of the presence of a foreign substance." *State v. Sliger*, No. 39315-1-III, slip op. at 2 (Wash Ct. App. Aug. 1, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/393151_unp.pdf. The court noted that an officer who is aware of the presence of a foreign substance in a subject's mouth cannot ignore its presence even if the subject denied having anything in their mouth. *Id*. at 10. However, the court made a distinction between a lump of chewing tobacco and tiny strands of tobacco for purposes of determining admissibility of a breath test. *Id*. Because Sliger denied having any foreign substances in his mouth, the officer did not consider the strands of tobacco to be a foreign substance, and the trial court likewise did not find the tobacco strands to constitute a foreign substance, the Court of Appeals concluded that the trial court did not err in determining that Sliger's denial alone constituted prima facie evidence that no foreign substances were present in his mouth. *Id*. at 2. Sliger sought discretionary review here. We granted review.

6

ANALYSIS

1. Foundational Requirements for the Admissibility of Breath Tests

In *State v. Baker*, 56 Wn.2d 846, 852, 355 P.2d 806 (1960), the seminal case addressing the admissibility of breath test results, this court held that four basic requirements must be met to admit the result of a breath test. *See also State v. Keller*, 2 Wn.3d 887, 892, 545 P.3d 790 (2024) ("In *Baker*, this court first established the foundational requirements for admitting breath tests performed by a Breathalyzer instrument into evidence."). One requirement was to check that "the subject had nothing in his mouth at the time of the test and that he had taken no food or drink within fifteen minutes prior to taking the test." *Baker*, 56 Wn.2d at 852. The court adopted four basic requirements because expert testimony showed that "unless the . . . four requirements [were] satisfied, the result of the test [was] wholly unreliable." *Id*. The court's central concern, and the crux of its reasoning, was reliability.

Ultimately, the legislature codified the foundational admissibility requirements for breath tests in RCW 46.61.506 back in 2004.[2] *Keller*, 2 Wn.3d at 894. Former RCW 46.61.506(4)(a) provides that

> [a] breath test performed by any instrument approved by the state
> toxicologist shall be admissible at trial or in an administrative proceeding if
> the prosecution or department produces prima facie evidence of the
> following:

---

[2] The legislature "incorporate[d] aspects of the *Baker* factors and the state toxicologist's regulations" when it codified the standards for admissibility. *Keller*, 2 Wn.3d at 894. The legislature directed the state toxicologist to establish and approve reliable testing methods, oversee qualified individuals to conduct blood and breath analyses, and issue or revoke permits to ensure testing is properly performed. RCW 46.61.506(3).

    (i) The person who performed the test was authorized to perform such test by the state toxicologist;

    (ii) The person being tested did not vomit or have anything to eat, drink, or smoke for at least fifteen minutes prior to administration of the test;

    (iii) The person being tested did not have any foreign substances, not to include dental work or piercings, fixed or removable, in his or her mouth at the beginning of the fifteen-minute observation period;

    (iv) Prior to the start of the test, the temperature of any liquid simulator solution utilized as an external standard, as measured by a thermometer approved of by the state toxicologist was thirty-four degrees centigrade plus or minus 0.3 degrees centigrade;

    (v) The internal standard test resulted in the message "verified";

    (vi) The two breath samples agree to within plus or minus ten percent of their mean to be determined by the method approved by the state toxicologist;

    (vii) The result of the test of the liquid simulator solution external standard or dry gas external standard result did lie between .072 to .088 inclusive; and

    (viii) All blank tests gave results of .000.

The only provision at issue here is former .506(4)(a)(iii), which requires that a person being tested not have any foreign substances in their mouth during the observation period. The legislature included a directive in .506(3) that states that "[t]he state toxicologist is directed to approve satisfactory techniques or methods, to supervise the examination of individuals to ascertain their qualifications and competence to conduct such [blood or breath] analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the state toxicologist."[3]

---

[3] The legislature amended this section effective June 30, 2027. However, these amendments do not impact our analysis. *See* LAWS OF 2026, ch. 108, § 2.

In accordance with this directive, the state toxicologist provided two alternative methods for determining the presence of a foreign substance in a subject's mouth. Under WAC 448-16-040, "[a] determination as to whether a subject has a foreign substance in his or her mouth will be made by either an examination of the mouth or a denial by the person that he or she has any foreign substances in their mouth." The term "foreign substances" is not defined in the statute or regulation.

2. Interpreting the Statutory Term "Any Foreign Substance"

Sliger argues that the trial court erred in admitting his breath test results because the State failed to present prima facie evidence of his mouth being free of any foreign substance when Deputy Kahns noted the presence of tiny strands of tobacco in between some of his teeth prior to administering the test. The statute describes "prima facie evidence" as "evidence of sufficient circumstances that would support a logical and reasonable inference of the facts sought to be proved." Former RCW 46.61.506(4)(b). When assessing the evidence, the court "is to assume the truth of the prosecution's . . . evidence and all reasonable inferences from it in a light most favorable to the prosecution." *Id.*

Sliger contends that the prosecution cannot meet its burden for admissibility here because the statutory term "any foreign substance" includes tiny strands of tobacco. He states that tobacco is a foreign substance and that "any" before the term "foreign substance" means that any quantity of a foreign substance, regardless of its size, results in an invalid test. We disagree.

9

Admissibility of evidence rulings are reviewed for abuse of discretion. *City of Auburn v. Hedlund*, 165 Wn.2d 645, 654, 201 P.3d 315 (2009). Yet the "'[i]nterpretation of a statute and its implementing regulations is a question of law,' which we review de novo." *Alaska Airlines, Inc. v. Dep't of Lab. & Indus.*, 1 Wn.3d 666, 673, 531 P.3d 252 (2023) (quoting *In re Impoundment of Chevrolet Truck*, 148 Wn.2d 145, 154, 60 P.3d 53 (2002)). Our primary duty "is to discern and implement the intent of the legislature." *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). We first consider a statute's plain language when interpreting a statute. *In re Pers. Restraint of Brooks*, 197 Wn.2d 94, 100, 480 P.3d 399 (2021). To discern the plain meaning of the statute we may look to "all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). "[I]f more than one interpretation of the plain language is reasonable, the statute is ambiguous, and the court must then engage in statutory construction." *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 789, 432 P.3d 805 (2019).

We construe statutes sensibly to effect their purpose and "will avoid [a] literal reading of a statute which would result in unlikely, absurd, or strained consequences." *Fraternal Ord. of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Ord. of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002). "The spirit or purpose of an enactment should prevail over the express but inept wording." *State v. Day*, 96 Wn.2d 646, 648, 638 P.2d 546 (1981).

The statute at issue here does not speak to quantity.  This is in line with how the

court in *City of Sunnyside v. Fernandez*, 59 Wn. App. 578, 582, 799 P.2d 753 (1990)

defined the term "foreign substance."  In *Fernandez*, the court was examining former

WAC 448-12-230 (1986), *repealed by* WSR 91-06-022 (Mar. 29, 1991) which stated,

"To obtain a valid breath test, it must be determined (a) that the subject has had nothing

to eat or drink for at least fifteen minutes prior to the administration of the test, and (b)

*that the subject does not have any foreign substances, not to include dental work, fixed or*

*removable, in his/her mouth at the beginning of the . . . observation period*."[4]  *Id*. at 581.

Since the term "foreign substance" was not defined in the code, the court looked to the

dictionary definition, which provided that "foreign means 'belonging to or proceeding

from other persons or things . . . not belonging to the place or body where found.'"  *Id*.

(alteration in original) (quoting RANDOM HOUSE DICTIONARY 749 (2d ed. 1987)).

However, the court did not stop there; it stated that the regulation should be interpreted

consistently with its underlying policy, which was to ensure accuracy of the test result.[5]

*Id*. at 582.  It determined that since "[t]he ultimate concern of the courts is for a reliable

---

[4] Sliger argues that *Fernandez* is not relevant because it was decided before the prima facie
evidence standard was codified in 2004.  However, in *Fernandez*, the repealed regulation being
analyzed is substantively similar to the statutory provision we are analyzing here.  There is no
meaningful reason to distinguish the definition of "foreign substance" provided in *Fernandez*
from the term "foreign substance" as used in former .506(4)(a)(iii).
[5] Sliger argues that we should accept the dictionary definition of "foreign substance" stated in
*Fernandez* but reject that the term "foreign substance" should involve only substances that would
adversely affect the accuracy of the test results.  However, the purpose of the statute informs our
plain language analysis.  *In re Adoption of T.A.W.*, 186 Wn.2d 828, 840, 383 P.3d 492 (2016)
("If the statute at issue, or a related statute, incorporates a relevant statement of purpose, our
reading of the statute should be consistent with that purpose.").  The purpose of the statute, as
discussed later, supports defining "foreign substances" as substances that affect the reliability or
accuracy of a test result.

and accurate measure of the subject's alcoholic breath content," then the term "foreign substance" should "involve substances which adversely affect the accuracy of [the] test results." *Id.*; *State v. Ford*, 110 Wn.2d 827, 833, 755 P.2d 806 (1988) ("The ultimate concern of the judiciary is that the methods approved result in an accurate test, competently administered, so that a defendant is assured that the test results do in fact reflect a reliable and accurate measure of his or her breath content.").

Interpreting "any" to mean any quantity of a foreign substance is not a reasonable interpretation of the statute considering the underlying policy and purpose of the statute. In codifying the foundational admissibility requirements for breath tests, the legislature found that

> previous attempts to curtail the incidence of driving while intoxicated have been inadequate. The legislature further finds that property loss, injury, and death caused by drinking drivers continue at unacceptable levels. This act is intended to convey the seriousness with which the legislature views this problem. To that end the legislature seeks to ensure swift and certain consequences for those who drink and drive.
>
> To accomplish this goal, the legislature adopts standards governing the admissibility of tests of a person's blood or breath. These standards will provide a degree of uniformity that is currently lacking, and will reduce the delays caused by challenges to various breath test instrument components and maintenance procedures. Such challenges, while allowed, will no longer go to admissibility of test results. Instead, such challenges are to be considered by the finder of fact in deciding what weight to place upon an admitted blood or breath test result.

LAWS OF 2004, ch. 68, § 1.

The legislature was addressing the serious problem of property loss, injury, and death caused by driving while intoxicated. It wanted to "ensure swift and certain

consequences for those who drink and drive." *Id*. To accomplish this goal, the

legislature adopted the standards that we are now considering. Through these standards,

the legislature intended to reduce delays caused by challenges to the tests and also made

the prima facie evidence standard favorable to the prosecution. *See* former RCW

46.61.506(4)(b) ("the court . . . is to assume the truth of the prosecution's . . . evidence

and all reasonable inferences from it in a light most favorable to the prosecution . . .").

Important to this case, when adopting the standards for admissibility, the

legislature expressly relegated subsequent challenges to its protocol to the weight of the

evidence, not its admissibility.

> Nothing in this section shall be deemed to prevent the subject of the test from *challenging the reliability or accuracy of the test*, the reliability or functioning of the instrument, or any maintenance procedures. Such challenges, however, *shall not preclude the admissibility of the test* once the prosecution or department has made a prima facie showing of the requirements contained in (a) of this subsection. Instead, such challenges may be considered by the trier of fact in determining *what weight* to give to the test result.

LAWS OF 2004, ch. 68, § 4 (emphasis added).

The legislature assigned to the State the initial burden of establishing a prima facie

case of admissibility, after which the defendant may challenge the reliability or accuracy

of the test. *City of Fircrest v. Jensen*, 158 Wn.2d 384, 399-400, 143 P.3d 776 (2006);

*City of Seattle v. Allison*, 148 Wn.2d 75, 79-80, 59 P.3d 85 (2002). Its intent was to

eliminate challenges to the admissibility of breath tests based on technical or procedural

deficiencies that have no adverse effect on the accuracy or reliability of test results. *See*

*City of Seattle v. Ludvigsen*, 162 Wn.2d 660, 681, 174 P.3d 43 (2007) (Madsen, J.,

13

concurring); *State v. Peterson*, 100 Wn.2d 788, 792, 674 P.2d 1251 (1984) ("Any challenge to the reliability of the Breathalyzer reading goes to its weight rather than to its admissibility.").

Interpreting "any" to mean any quantity of a foreign substance would lead to absurd results. This interpretation would mean that the presence of microscopic amounts of a foreign substance would prevent the admissibility of breath test results regardless of whether it has any impact on the reliability of the test. Officers are not equipped to conduct a thorough inspection of an individual's mouth for any strand or speck of a foreign substance. In accordance with *Fernandez*, a more reasonable interpretation is that "any foreign substance" refers to any kind of foreign substance capable of impacting the reliability of the test results.

Here, Deputy Kahns observed the presence of tiny strands of tobacco in between some of Sliger's teeth, but he did not have Sliger remove the strands prior to administering the Draeger breath test because his training led him to believe that a few strands of tobacco would not impact the reliability or accuracy of the breath test. To meet its prima facie burden for admissibility, the State provided expert testimony from a breath test technician who testified that a few strands of tobacco are different from a lump of tobacco. Trooper Axtman stated that the purpose of the 15-minute observation period and removal of foreign substances is to ensure that any mouth alcohol dissipates prior to taking the test. He further testified that residual strands of chewing tobacco in Sliger's teeth would not affect the validity of the breath testing. The court is to assume

the truth of the evidence presented by the prosecution. Here, the State met its burden. The defendant will still have the opportunity to refute the reliability of the test result at trial by presenting expert testimony to the contrary.

To be clear, the State does not need to provide expert testimony in every case to meet its prima facie burden for admissibility if an officer observes no foreign substance or the defendant denies the presence of a foreign substance. However, in cases involving the debatable presence of a foreign substance, the State makes a prima facie case only by presenting an expert to attest that the substance does not impact the reliability of the test.

## CONCLUSION

We hold that the State met its burden of establishing prima facie evidence that Sliger's mouth was free of any foreign substances when it presented expert testimony that the tiny strands of tobacco would not affect the reliability of the Draeger breath test results. We affirm the Court of Appeals.



Madsen, J.P.T.

WE CONCUR:

Stephens, C.J.

_____

Johnson, J.

Whitener, J.

_____          _____

_____          _____

*State v. Sliger*, No. 103563-2 (González, J., concurring in result)

No. 103563-2

GONZÁLEZ, J. (concurring in result)—Under Washington's implied consent statute, an arresting officer with reasonable grounds to believe a person drove under the influence of alcohol may administer a breath test measuring the concentration of alcohol in the deep lung air that the driver exhales. RCW 46.20.308(1). Before the State can use that measurement at trial, the State must show that the breath test complied with methods approved by the state toxicologist and various statutory procedures. Former RCW 46.61.506(3)-(4)(2020).[1] Among other things, the State must produce prima facie evidence that the person providing a breath sample did not have "any foreign substances" in their mouth during a 15-minute observation period. Former RCW 46.61.506(4)(a)(iii). The State must strictly comply with this breath alcohol test admissibility requirement. *State v. Keller*, 2 Wn.3d 887, 919, 545 P.3d 790 (2024) (collecting cases). Under a rule promulgated by the toxicologist, whether there is a foreign substance in a person's

_____

[1] The legislature amended RCW 46.61.506 in 2026, effective June 11, 2026. The amendment resulted in the renumbering of some subsections, but it does not affect my analysis. Here I use the section numbers in effect at the time of the action.

1

mouth may be determined either through an examination of that person's mouth or through that person's denial that they have any foreign substances in their mouth. WAC 448-16-040(1).

At the admissibility stage, the trial court's role is limited. In this context, our legislature defines "prima facie evidence" as "evidence of sufficient circumstances that would support a logical and reasonable inference of the facts sought to be proved." Former RCW 46.61.506(4)(b). Our legislature further directs the trial court to "assume the truth" of the State's evidence and "all reasonable inferences from it in a light most favorable to the" State when deciding admissibility. *Id.*

John Henry Sliger seeks to suppress results from his breath alcohol test based on the presence of visible strands of tobacco in his mouth. Sliger denied having foreign substances in his mouth. Based on Sliger's denial, the trial court admitted his breath test results. The Court of Appeals affirmed on this basis. The lead opinion would affirm because the State presented expert testimony that the strands of tobacco would not affect the reliability of the breath test results. While I agree that the State presented sufficient evidence, the State was not required to present expert testimony for Sliger's breath test results to be admissible.

Under WAC 448-16-040(1), the State strictly complied with former RCW 46.61.506(4)(a)(iii). Specifically, I would hold that the phrase "any foreign substances," properly construed in light of the statutory scheme and the absurd

2

results that would follow from a contrary reading, means no more than a de minimis quantity of a foreign substance.  Former RCW 46.61.506(4)(a)(iii).  When a person denies having any foreign substances in their mouth, as occurred here, there is a reasonable inference that no more than a de minimis quantity of foreign substances is in their mouth.  While the observation of tobacco strands may support a competing inference for the jury to consider, the existence of competing inferences does not preclude admissibility of breath test results under former RCW 46.61.506(4)(b).  The defense, of course, is free to challenge the reliability of the breath test at trial if it has grounds to do so.  *See* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 92.16, at 363 (5th ed. 2021) ("In determining the accuracy and reliability of a [breath] [blood] test, you may consider the testing procedures used, the reliability and functioning of a testing instrument, maintenance procedures applied to a testing instrument, and any other factors that bear on the accuracy and reliability of the test." (alterations in original)).  But here, the only question is whether Sliger's breath test results are admissible.

 With these observations, I respectfully concur in result.

González, J.

González, J.

*State v. Sliger*

No. 103563-2

MUNGIA, J. (dissenting)—Washington State Patrol (WSP) trains its officers that chewing tobacco is a foreign substance. If a person has chewing tobacco in their mouth, then the officer is to have the person rinse their mouth before administering a breath alcohol test. Deputy Mitchell Kahns failed to follow WSP procedures.

The legislature has set forth clear rules that must be followed to have breath alcohol test results admitted into evidence. One of the requirements is that there cannot be "any foreign substances" in the person's mouth for 15 minutes before the test is administered. Chewing tobacco is a foreign substance. Deputy Kahns saw that Mr. Sliger, after having spit out chewing tobacco, still had bits of tobacco in his mouth. Despite that fact, and despite WSP protocols, Deputy Kahns did not have Mr. Sliger rinse his mouth with water to remove the tobacco.

Deputy Kahns failed to comply with statutory requirements. Deputy Kahns failed to comply with WSP protocols. The trial court erred in finding that the test results were admissible at trial.

I would reverse. I accordingly dissent.

I

Mr. Sliger Had a Foreign Substance in His Mouth Within 15 Minutes of the Breath Alcohol Test

Mr. Sliger had strands of tobacco in his mouth within 15 minutes of the breath alcohol test. Tobacco is a substance foreign to the human body.

Mr. Sliger had been chewing tobacco at the scene of the accident. He removed a large portion of the chewing tobacco from his mouth at the accident scene.

Deputy Kahns took Mr. Sliger to the Stevens County Jail. At the jail, Deputy Kahns administered a breath alcohol test. Before administering the test, Deputy Kahns looked into Mr. Sliger's mouth. He saw that there was a small amount of tobacco still remaining. Despite that fact, and against WSP procedures, Deputy Kahns administered the breath test.

Before trial started, Mr. Sliger moved the trial court to suppress the test results because Deputy Kahns did not comply with the statutory requirements. When questioned at the pretrial hearing, Deputy Kahns testified, "They were just small strands of tobacco, chewing tobacco that were small, thin, really short. I don't really know how else to explain that." Verbatim Rep. of Proc. (VRP) at 29. The court followed up with its own questions probing Deputy Kahns' memory.

> THE COURT: You describe tiny tobacco strands stuck in teeth as small and short strands of chewing tobacco. Do you recall what that looked like in the defendant's mouth? Can you recall what you saw?

> THE WITNESS: They're—they're brown, small strands of chewing tobacco. I can picture chewing tobacco stuck in my own teeth or somebody

2

else's.  But I don't recall in that instance by what teeth they were between or exactly how big they were, if that's what your question is.

THE COURT: Well, I guess I'm wondering, you have tiny tobacco strands stuck in teeth, if—if that's tobacco stuck in all of his teeth or that was like debris, more like debris.

THE WITNESS: It was just debris.

THE COURT: Okay.

THE WITNESS: Debris in just a few of the teeth, not in every single one of them.

THE COURT: And you're able to recall that?

THE WITNESS: I can recall that it was not in every single tooth.[1]

VRP at 32-33.

The trial court denied Mr. Sliger's motion, instead ruling that the test results met the statutory requirements and thus were admissible.

## II
## FOR THE RESULTS OF A BREATH ALCOHOL TEST TO BE ADMISSIBLE, THE STATE MUST FOLLOW THE RULES THE LEGISLATURE HAS ENACTED

The legislature has set out the rules that must be followed for a breath alcohol test to be admissible.  Breath alcohol tests results are inadmissible unless the test sample is collected in a manner that strictly complies with these rules.  *See State v. Keller*, 2 Wn.3d 887, 919, 545 P.3d 790 (2024).  The legislature, not the courts, has decided what those rules are.  Whether this court believes the requirements are too strict is irrelevant to our

---

[1] The lead opinion asserts that Deputy Kahns "testified that the strands were in between just a few of Sliger's teeth."  Lead opinion at 4.  That is not accurate.  As shown above, all he could testify to was that the tobacco "was not in every single tooth."  VRP at 33.

3

review. Instead, we must give effect to the plain language of the statute if it is

unambiguous. *Dep't of Ecology v. Campbell & Gwinn, LLC,* 146 Wn.2d 1, 9, 43 P.3d 4

(2002).

The statute at issue here is unambiguous.

In former RCW 46.61.506(4)(a)(i)-(viii) (2020),[2] the legislature set forth the

requirements for admissibility. One of those requirements is that the prosecution must

produce prima facie evidence that the person being tested "did not have any foreign

substances" in their mouth at the beginning of the 15-minute observation period. Former

RCW 46.61.506(4)(a)(iii).

Here, the State failed to meet that elemental requirement. The prima facie

evidence it produced showed that Mr. Sliger had a foreign substance in his mouth.

However, the lead opinion upholds the trial court's decision to admit the test

results by changing the requirements imposed by the legislature. The lead opinion

effectively amends the statute to create an exception, adding a clause to the statute: The

person being tested must not have any foreign substances in their mouth at the beginning

of the 15-minute observation period unless a law enforcement officer thinks the foreign

substance would not affect the validity of the breath test and, in disputed cases, if the

State provides expert testimony in support. *See* lead opinion at 2-3, 14.

---

[2] The legislature amended RCW 46.61.506 in 2026, effective June 11, 2026. The
amendment resulted in the renumbering of some subsections but it does not affect our
analysis. Here we use the section number in effect at the time of the action.

The above may be a good rule. The above may track our prior cases. But it is not the rule that the legislature adopted. It is a basic principle of statutory interpretation that we "must not add words where the legislature has chosen not to include them." *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003). The legislature adopted a bright line rule: make sure the person taking the test does not have anything in their mouth that should not be there. The statute does not give discretion to the officer, does not include an "expert testimony" exception, and does not ask the court to determine whether a foreign substance affects accuracy.

The rule the legislature mandated is not difficult to comply with. The *Washington State Patrol Breath Test Training Manual* addresses the specific situation presented in this case:

> Upon checking the person's mouth for foreign objects before starting the 15 minutes, clear the person's mouth of all foreign substance except dental work and piercings, and if necessary have the person rinse their mouth. (i.e., chewing tobacco, etc.)

Clerk's Papers (CP) at 71. The statute's language is clear, and the WSP training manual follows the statute.

And yet, the lead opinion holds that Deputy Kahns did not have to comply with this rule and remove foreign substances from Mr. Sliger's mouth "because his training led him to believe that a few strands of tobacco would not impact the reliability or accuracy of the breath test." Lead opinion at 14. This conclusion is flawed for a number of reasons.

5

First, there is nothing in the record to show that Deputy Kahns would know whether chewing tobacco would impact the reliability or accuracy of the breath test or how much chewing tobacco would be needed to affect that reliability. Deputy Kahns was trained in how to give the test—there is nothing in the record demonstrating that he was trained on how different amounts of foreign substances affect the test.

Second, the legislature made the policy decision that it did not want law enforcement officers making a judgment call about how much of a foreign substance is too much. The legislature laid out a bright line rule: make sure there are no foreign substances in the person's mouth. While the legislature could have made the standards for admissibility flexible and given law enforcement officers discretion, it did not take that path. One benefit of the legislature's bright line rule is that it avoids disputes as to the amount of a foreign substance that could remain in a person's mouth before it would affect the validity of a breath alcohol test. The legislature did not want admissibility determinations to hinge on one officer's judgment call.

The trial court and the lead opinion ignore the clear language of the statute. This court should not change the wording of a statute to what it believes is a better procedure but instead must follow the clear rule the legislature enacted.

III

THE LEAD OPINION'S ATTEMPT TO DEFINE THE TERM "FOREIGN SUBSTANCES" GOES
AGAINST THE LEGISLATIVE DIRECTIVE

The lead opinion opines that "foreign substances" should be defined as substances "'which adversely affect the accuracy'" of the test results. Lead opinion at 12 (quoting *City of Sunnyside v. Fernandez*, 59 Wn. App. 578, 582, 799 P.2d 753 (1990)).

First, once again, the lead opinion is adding language to the statute that the legislature did not include and, in fact, changes the statute from a straightforward test to one where expert witnesses may be required to testify to determine the threshold question of admissibility.

Second, the lead opinion incorrectly relies on the Court of Appeals case of *Fernandez*, 59 Wn. App. 578, for its definition of "foreign substance." That case held that a person's own blood was not a foreign substance for purposes of breath alcohol test admissibility. Former WAC 448-12-230 (1986), *repealed by* WSR 91-06-022 (Mar. 29, 1991). The *Fernandez* court, in its analysis, relied on a dictionary definition to conclude that "foreign" means "'belonging to or proceeding from other persons or things . . . not belonging to the place or body where found.'" *Id*. at 581 (alteration in original) (quoting RANDOM HOUSE DICTIONARY 749 (2d ed. 1987)). The court, using that definition, concluded that one's "blood does belong to the person or body where it is found." *Id*. at 582. That was the holding of the case.

The court also stated "foreign substance" should "involve substances which adversely affect the accuracy of test results." *Id.*. I read this statement as dicta, and the

7

lead opinion is incorrect to rely on it. However, even if the *Fernandez* court intended to incorporate "accuracy" into the definition of "foreign substance" as an alternate basis for its holding, this was error. Under the statute, the court makes the threshold determination of whether test results are admissible, while accuracy is a question for the jury. Former RCW 46.61.506(4)(a), (c). The two should not be mixed together.

The lead opinion also cites as support *State v. Ford*, 110 Wn.2d 827, 755 P.2d 806 (1988). That case did not involve defining the term "foreign substance." That case did not involve the statute at issue here. Instead, the court reviewed the state toxicologist's method for ensuring the reliability of a breath alcohol test. That case does not support the lead opinion's analysis.

Finally, the lead opinion argues that "any" cannot mean "any" because if it did, then even debris not visible to the human eye, i.e., microscopic substances, would make any test result inadmissible.

This argument likewise fails.

No one argues that the legislature meant to include microscopic materials when it used the term "foreign substances." Instead, the regulation provides that an officer's visual inspection, with the unaided eye, can provide prima facie evidence that there are no foreign substances in that person's mouth. WAC 448-16-040(1). That prima facie finding will remain unless there is rebutting evidence.

IV

THE OFFICER'S FACTUAL OBSERVATIONS ARE PRESUMED TO BE ACCURATE; THEIR
LEGAL CONCLUSIONS ARE NOT GIVEN ANY WEIGHT

The lead opinion is correct that WAC 448-16-040 provides two methods for an

officer to determine whether there are any foreign substances in a person's mouth:

1.  By examining the mouth or

2.  By having the person deny that there is any foreign substance in their mouth.

The lead opinion is also correct that former RCW 46.61.506(4)(b) requires the

court to assume the truth of the State's evidence together with all reasonable inferences

from that evidence in the light most favorable to the State.

Neither of these directives support the lead opinion's conclusion that chewing

tobacco is not a foreign substance.

If the person taking the breath test states that they do not have any foreign

substances in their mouth, and the officer does not check their mouth, then there is prima

facie evidence that indeed the person does not have any foreign substances in their

mouth.

If an officer checks a person's mouth and does not see anything in their mouth,

that too is prima facie evidence that there are not any foreign substances in the person's

mouth.

Here, even though Mr. Sliger said there were no foreign substances in his mouth,

Deputy Kahns saw the bits of tobacco in Mr. Sliger's mouth.  The initial prima facie

9

showing that there were no foreign substances was rebutted by Deputy Kahns' visual inspection.

The court must assume the truth of the State's evidence, and that evidence here was Deputy Kahns' notation that he saw bits of tobacco in Mr. Sliger's mouth. The statute does not require the court to defer to Deputy Kahns' belief that the bits of tobacco were not a foreign substance. Deputy Kahns' personal opinion has no weight and does not bear on the court's legal conclusion.

The *Fernandez* court similarly concluded that the court does not defer to the personal opinion of agency employees for rule interpretation. There, a forensic toxicologist supervisor with the Washington State Toxicology Laboratory opined that it was not the code drafter's intent to consider a person's own blood as a foreign substance. *Fernandez*, 59 Wn. App. at 581. The court noted that courts give weight to an agency's interpretation of a rule. However, this interpretation must come from the agency's legislative and regulatory power or rulings of an agency or its officers, not from an individual employee's subjective understanding of the agency's intent. *Id.* The same is true here. Deputy Kahns' personal belief that bits of tobacco are not a foreign substance carries no weight. Instead, what does carry weight is the official policy of the WSP that identifies chewing tobacco as a foreign substance and that states that a person who has been chewing tobacco must rinse their mouth before taking the test.

10

V

CONCLUSION

This case involves an officer who failed to follow a WSP procedure requiring a person to rinse chewing tobacco out of their mouth before taking a breath alcohol test. By failing to follow this straightforward procedure, the officer failed to comply with requirements set forth by the legislature for the admissibility of those test results. Under the unambiguous terms of the statute, the test results are inadmissible.

Everyone will agree that property loss, bodily injury, and death caused by people who are intoxicated is a serious problem. The State, pursuing the goal of keeping an allegedly intoxicated driver accountable for an accident, attempted to have the breath alcohol test results admitted. However, the officer's failure to follow procedure makes those test results inadmissible. A statute's terms cannot be changed to address a situation where the officer failed to follow required procedures.

I would reverse the trial court's order denying Mr. Sliger's motion to suppress the breath alcohol test results. Without the test results, the State may or may not have enough evidence to convince a jury that Mr. Sliger was intoxicated at the time of the accident.[3] However, it is not the court's role to assist one party or the other to obtain a

_____

[3] The record documents that Deputy Kahns asked Mr. Sliger if he had been drinking prior to the accident and that Mr. Sliger admitted that he had. Deputy Kahns administered a number of field sobriety tests to Mr. Sliger with Mr. Sliger responding in ways that led Deputy Kahns to arrest him for driving under the influence. Further, Mr. Sliger's blood was drawn at the hospital and tested for alcohol prior to his being booked into jail. Whether some or all of this evidence will be admitted at trial remains to be seen.

certain result. Instead, it is the court's role to carry out the rule of law, which, in this

case, means adhering to the statutory requirements.

I accordingly dissent.

Mungia, J.

Gordon McCloud, J.

Montoya-Lewis, J.

Yu, J.P.T.